TTC ILLINOIS, INC./TOM VIA TRUCKING, Appellant, v. ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (Donald Keen, Appellee).—TTC ILLINOIS, INC./TOM VIA TRUCKING, Appellant, v. ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (Donald Keen, Appellee).

Fifth District (Illinois Workers' Compensation Commission Division)
Nos. 5—08—0644WC, 5—08—0645WC cons.

Opinion filed November 10, 2009.

Matthew Pelikan and Gregory T. Cook, both of McAnany, Van Cleave & Phillips, of St. Louis, Missouri, for appellant.

David A. Nester and Patrick J. Madigan, both of Nester & Constance, P.C., of Belleville, for appellee.

JUSTICE HOFFMAN delivered the opinion of the court:

TTC Illinois, Inc./Tom Via Trucking and the Illinois Insurance Guaranty Fund (hereinafter collectively referred to as the Employer/Fund) filed the instant consolidated appeals from separate judgments of the circuit court of Williamson County which confirmed two decisions of the Illinois Workers' Compensation Commission (Commission) awarding the claimant, Donald Keen, benefits under the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 1998)). For the reasons that follow, we affirm both judgments.

On September 11, 2000, the claimant filed two applications for adjustment of claim pursuant to the Act, seeking benefits for injuries he alleged that he received while in the employ of Tom Via on May 28, 1998 (docket No. 00 WC 050293), and January 6, 1999 (docket No. 00 WC 050294). On April 25, 2005, both cases were dismissed for want of prosecution by an arbitrator when the claimant failed to appear on a set hearing date.

The Commission's official docket entries reflect that the claimant filed petitions to reinstate both cases on June 27, 2005. However, the petitions did not set forth a date on which the claimant would appear before the arbitrator and present his petitions, and there is no evidence of record that any notices of motion were filed along with the petitions. The record does contain copies of notices of motion dated October 31, 2006, setting the petitions for reinstatement for hearing before the arbitrator on that same date at 9 a.m. The record does not contain a transcript of the proceedings before the arbitrator on October 31, 2006. The transcript of the proceedings before the arbitrator on March 14, 2007, which is contained in the record, reflects that the petitions for reinstatement came before him on that date, having been continued from February 13, 2007. According to the transcript of the March 14, 2007, proceedings, the claimant's attorney represented to the arbitrator that, in June of 2005, one of the attorneys representing Tom Via orally agreed to the reinstatement of both cases, and she subsequently issued a letter agreeing to their reinstatement. The claimant's attorney went on to state the following:

"So I just want it clear on the record that the reason the Order to Reinstate was not signed shortly after the Petition to Reinstate is that both parties agreed to reinstate it, but it would be done at a convenient time for the parties when they were both in front of Judge Dibble [the arbitrator] on another case or another matter."

Addressing the issue of reinstatement, the arbitrator stated:

"You thought it was by stipulation, and it was at one point, and now it's not; is that correct?"

The attorney for Tom Via responded:

"Basically, but with respect to that, there never was a meeting before the judge to discuss the issue."

Immediately thereafter, the arbitrator granted the petitions and reinstated both of the claimant's cases. In further support of his assertion that the parties had agreed to reinstate the cases, the claimant's attorney relies upon a letter he received dated October 31, 2006, from one of Tom Via's attorneys in which she states:

"Pursuant to our conversation, please be advised that my client has no objection to reinstatement of Mr. Keen's workers' compensation claims: 00 WC 050293 and 00 WC 050294."

Following their reinstatement, the claimant's cases were tried simultaneously before the arbitrator. The following factual recitation is taken from the evidence presented at the arbitration hearing.

The claimant was employed by Tom Via as a diesel technician. On July 16, 1996, the claimant injured his back when he and a co-employee were lifting a truck radiator estimated to weigh 300 pounds. The claimant came under the care of Dr. Alan Froehling an orthopaedic surgeon. X-rays of the claimant's back revealed no evidence of any fractures. Dr. Froehling diagnosed the claimant as suffering from a severe lumbar strain and prescribed pain medication.

Dr. Froehling treated the claimant conservatively, prescribing physical therapy and traction. In his notes of a visit on August 14, 1996, Dr. Froehling wrote that the claimant had a full range of motion and was without pain. Dr. Froehling released the claimant from treatment and authorized him to return to work on August 20, 1996.

The claimant's wife, Tammy Keen, who by the time of the arbitration hearing had been appointed as the claimant's guardian, testified that from the time the claimant returned to work in August of 1996 until May 28, 1998, the claimant did not suffer any further back injuries.

It is uncontested that, on May 28, 1998, the claimant injured his back at work while lifting the front-end spring assembly of a truck which weighed approximately 150 pounds. On June 1, 1998, the claimant sought treatment from Dr. Froehling. In a note of the claimant's visit on that date, Dr. Froehling wrote that the claimant reported severe low-back pain and numbness in his upper right leg. On examination, the doctor observed spasms in the claimant's low back and limited range of motion. X-rays of the claimant's lumbar spine were "essentially negative." As of that visit, Dr. Froehling diagnosed a severe back strain with some mild left sciatic symptoms. He prescribed pain medication and ordered an MRI scan.

The claimant next saw Dr. Froehling on June 15, 1998, after having an MRI as ordered. Dr. Froehling's notes of that visit state that the MRI showed a central disc herniation at L4-L5 on the left, but the quality of the images was degraded by a motion artifact. The doctor also noted a "little central bulge at L5-S1 that might also be a small disc herniation." He opined that the claimant was in need of a myelogram and CT scan and noted that he would consider administering lumbar epidural steroid injections.

On July 20, 1998, the claimant underwent a lumbar myelogram. The report of that procedure states that no apparent disc herniation was identified. A slight elevation of the thecal sac at L4-L5 and a very mild impression upon the anterior aspect of the thecal sac at L2-L3

and L3-L4 were noted. According to that report, the claimant's nerve root sheaths appeared normal and the neural arches were intact. Immediately following the lumbar myelogram, the claimant had a CT scan of his lumbar spine. The report of that scan states that no apparent spinal stenosis or disc herniation was identified throughout the spine. Minimal diffuse disc impression upon the anterior aspect of the thecal sac at L4-L5 was noted. However, no significant impression on the thecal sac or traversing nerve roots was observed. A slight bilateral facet arthropathy at L4-L5 and L5-S1 was also noted.

The claimant continued to treat with Dr. Froehling. He received a series of lumbar epidural steroid injections and underwent physical therapy. Throughout his treatment, the claimant continued to complain of back pain and exhibited flexion intolerance. Dr. Froehling opined that the claimant had a small disc herniation on the left, although "[i]t didn't show too well on the myelogram or CT scan."

At the request of Tom Via, the claimant was examined on October 20, 1998, by Dr. Sherwyn Wayne. In his report of that examination, Dr. Wayne stated that the claimant reported left lower back and buttock pain, which intensifies with prolonged sitting and coughing, and that he received no lasting relief or improvement from the epidural steroid injections or physical therapy. Dr. Wayne outlined the results of his physical examination of the claimant and his review of the claimant's MRI scan, myelogram, and post-myelogram CT scan. According to the report, Dr. Wayne found no objective evidence substantiating the claimant's ongoing complaints. He opined that the claimant required no further diagnostic measures or medical treatment. Dr. Wayne suggested only that the claimant follow an appropriate daily program of back exercises and that he lose weight. Dr. Wayne found that the claimant had reached maximum medical improvement and was capable of performing his previous work duties. Dr. Wayne opined that the claimant may have initially sustained a mechanical lumbar strain, but there is no evidence of any ongoing pathology or any objective evidence of a permanent partial disability attributable to the claimant's injury at work on May 28, 1998.

Following his examination by Dr. Wayne, the claimant continued under the care of Dr. Froehling. The doctor's records reflect that the claimant continued to complain of leg and back pain. On October 26, 1998, Dr. Froehling wrote in his notes that he thought that the source of the claimant's pain was his left L4-L5 disc. Because the doctor felt that the earlier imaging studies of the claimant's back were not conclusive, he recommended that the claimant undergo an EMG.

Dr. Froehling's notes of a November 16, 1998, visit reflect that the claimant had returned to work and was performing his regular duties.

The note also states that the claimant was still complaining of pain in his left leg. Dr. Froehling wrote that he reviewed the claimant's EMG but that it was "pretty nonspecific."

On January 6, 1999, while the claimant was working at Tom Via, a fuel tank exploded, throwing the claimant 20 to 30 feet. The claimant suffered fractured ribs; compression deformities and fractures of the thoracic vertebrae T8, T10 and T11; a left high partial scalp hematoma with subcutaneous emphysema; a small right frontal scalp hematoma; a closed head injury; a ruptured spleen; and a pulmonary contusion.

The claimant was hospitalized at the Barnes/Jewish Hospital from January 7, 1999, through January 27, 1999. While hospitalized, the claimant exhibited delusional and aggressive behavior, memory and attention impairment, and behavioral changes; all consistent with a traumatic head injury.

Following his discharge from the hospital, the claimant received speech therapy, occupational therapy, physical therapy, communicative and cognitive therapy, behavioral therapy, and counseling services. The records of the claimant's treatment reveal that, in addition to other conditions, he suffered from chronic back pain and headaches.

Without exception, the claimant's treating physicians opined that he suffered permanent injuries which prevented him from engaging in gainful employment.

For the first time since his visit on November 16, 1998, the claimant was again examined by Dr. Froehling on July 15, 2002. In a report of that visit, Dr. Froehling noted that, as a result of the explosion on January 6, 1999, the claimant sustained catastrophic injuries, including multiple vertebral compression fractures. He wrote that the claimant was suffering from chronic back pain for which he was taking pain medication. Dr. Froehling observed that the claimant appeared to be having problems with both the thoracic and lumbar spine. According to his report, Dr. Froehling reviewed the claimant's bone scan and "plain films," which revealed fractures with compression of T8 and T11 that the doctor found may be chronic with some healing problems. However, before recommending further surgical intervention, Dr. Froehling suggested that the claimant undergo a new MRI of his thoracic and lumbar spine.

As recommended by Dr. Froehling, the claimant had an MRI of both his thoracic and lumbar spine on July 17, 2002. As to the claimant's thoracic spine, the radiologist's report contains an impression of a moderate compression fracture of T8 without cord compression. As to the claimant's lumbar spine, the radiologist noted disc degeneration at multiple levels without significant mass effect and

disc desiccation at L2-L3, L3-L4, L4-L5, and L5-S1. The report states that no evidence of spinal stenosis or neural foraminal stenosis in the lumbosacral spine was detected.

In a report dated July 24, 2002, Dr. Froehling outlined his review of the claimant's July 17, 2002, MRI. Dr. Froehling noted the findings as to the thoracic spine, particularly the evidence of a fracture at the T10-T11 facet joint. The report states that the claimant continued to suffer from low-back pain, which Dr. Froehling believed was caused by the derangement of the T10 joint. Dr. Froehling discussed the possibility of a surgical decompression at T10-T11 with the claimant, but recommended a continued course of conservative treatment. The report makes no mention of any symptoms related to the claimant's lumbar spine.

When deposed on November 14, 2002, Dr. Froehling testified that, although he was not sure he could pinpoint the source, he was of a belief that the claimant's T8 and T11 vertebrae were responsible for his back pain. He stated that the claimant's complaints of pain were consistent with compression fractures in this area.

In his notes of a visit on January 17, 2003, Dr. Froehling attributed the severe pain which the claimant was suffering to an instability at T8 evidenced on a bone scan. As of this examination, Dr. Froehling recommended that the claimant undergo a posterior fusion with instrumentation from T6 down to T11.

The claimant continued to see Dr. Froehling. In his notes of an examination on June 11, 2003, Dr. Froehling wrote that the claimant complained of headaches and back pain which he attributed to the claimant's chronic compression fractures. The doctor recommended that the claimant have an MRI scan of his thoracic spine.

The claimant had the MRI as recommended and returned to see Dr. Froehling on July 17, 2003. In his notes of that visit, Dr. Froehling wrote that his review of the claimant's recent MRI revealed a small disc herniation at T9-T10, some deterioration in the claimant's spinal condition, and a fracture at T8. Dr. Froehling noted that the claimant's pain was mainly between his shoulder blades.

Dr. Froehling's records reflect that he next saw the claimant on January 28, 2004. At that visit, the claimant complained of pain in his upper back. According to the doctor's notes, there were no new findings on clinical examination of the claimant.

On the recommendation of Dr. Froehling, the claimant had an MRI of his lumbar spine on May 27, 2005, and an MRI of his thoracic spine on June 1, 2005. The radiologists' reports of those scans contain impressions of a large disc herniation at L5-S1, fracture deformities at T8 and T11, hemangiomas at T7 and T10, moderate spinal stenosis at

T10-T11, and compression changes upon the thoracic dural sac at T9-T10.

The claimant saw Dr. Froehling on June 2, 2005, at which time he complained of increased low-back pain along with pain in his right hip and leg. The doctor's notes of that visit state that the claimant was limping and had numbness in the lateral toes on his right foot. Dr. Froehling recorded the results of the MRIs of the claimant's lumbar and thoracic spine. As to the claimant's thoracic spine, the doctor wrote that the scan showed some progressive stenosis at T9-T10 and T10-T11 which may ultimately require decompression. As to the MRI of the claimant's lumbar spine, Dr. Froehling noted "a new finding of disc herniation, not present on his 2002-X-rays[;] *** a very large extruded fragment on the right at L5-S1, compressing the right S1 nerve root." Due to the claimant's severe and intractable pain, Dr. Froehling recommended a laminectomy and discectomy at L5-S1.

Dr. Froehling's notes of the claimant's visit on June 29, 2005, state:

"Donald and I had a conversation about his disc herniation. In 2002, he had a bulging disc at L4-5. At that time, he had a desiccated L5-S1 disc, but no bulging or herniation. Now he has a herniation at L5-S1. These interval findings suggest that it is going to be hard to make a causal relationship for him. Based on this, we are going to run things through his group insurance carrier. His wife is asking to talk to the attorney, and that will be fine."

On the following day, June 30, 2005, Dr. Froehling made the following entry in his records:

"Donald's wife came in to drop off the report from the 1999 MRI scan that in fact did show that he had tiny bulges at L4-5 and L5-S1 way back in those days. I explained to her what I thought this meant. She and I commiserated a little bit about Donny's condition, and how we are going to go ahead and take care of him. He is scheduled for surgery."

On July 8, 2005, the claimant underwent a lumbar laminectomy and discectomy at L5-S1 to decompress the right S1 nerve root. Dr. Froehling continued to treat the claimant postoperatively. According to a letter from Dr. Froehling to the claimant's attorney, following the surgery, the claimant experienced "good relief" from his leg pain and his lumbar pain symptoms gradually resolved.

In that same letter, which was dated March 3, 2007, Dr. Froehling wrote that the claimant's 1998 injury never fully resolved. According to the letter, the claimant returned to work following his injury in 1998 with continued complaints of significant lumbar pain. He noted that there was "demonstrated evidence of injury to the L4/5 and L5/S1 discs at that time." That letter contains the following paragraph:

"Over a period of time, his lumbar condition deteriorated to the extent that a disc herniation developed at L5/S1, which required surgical intervention. I believe that the 1998 injury played a significant role with respect to the causation of the disc herniation and is related to the need for the surgery in 2005. With respect to impairment/disability, the lumbar condition would be expected to affect his ability to perform diesel mechanic tasks with impairments in bending and lifting, estimated at 20% of a man as a whole."

Following the consolidated hearing on both of the claimant's cases, the arbitrator issued separate decisions. In his decision in case No. 00 WC 050293, relating to the May 28, 1998, incident, the arbitrator found that the claimant sustained low-back injuries at L5-S1 arising out of and in the course of his employment with Tom Via and that timely notice was given. The arbitrator awarded the claimant permanent partial disability benefits under section 8(d)(2) of the Act (820 ILCS 305/8(d)(2) (West 1998)) for a 25% loss of a person as a whole and ordered Tom Via to pay all of the outstanding medical bills incurred by the claimant as a result of the incident, including the expenses related to a lumbar laminectomy and discectomy at L5-S1 which the claimant underwent on July 8, 2005.

In his decision in case No. 00 WC 050294, relating to the January 6, 1999, incident, in which the claimant suffered numerous injuries as the result of an explosion, the arbitrator found that the claimant's injuries arose out of and in the course of his employment with Tom Via and that timely notice was given. Finding that the claimant was totally and permanently disabled, the arbitrator awarded the claimant benefits under section 8(f) of the Act (820 ILCS 305/8(f) (West 1998)) for the remainder of his lifetime.

Tom Via sought reviews of both of the arbitrator's decisions before the Commission. In separate unanimous decisions, the Commission affirmed and adopted the arbitrator's decisions.

The Employer/Fund filed separate actions in the circuit court of Williamson County for judicial review of the Commission's decisions. The circuit court confirmed both decisions, and the Employer/Fund filed timely notices of appeal. This court, on its own motion, consolidated the appeals for disposition.

Before addressing the issues raised by the Employer/Fund in these consolidated appeals, we are compelled to comment on the Employer/Fund's failure to file a brief in compliance with Supreme Court Rule 342 (210 Ill. 2d R. 342). Supreme Court Rule 342(a) provides, in relevant part, that the appellant's brief shall include an appendix containing, among other things, a complete table of contents of the

record on appeal with page references. "The table shall state: (1) the nature of each document, order, or exhibit." 210 Ill. 2d R. 342(a).

■ In this case, the record consists of 2,471 pages contained in 12 volumes. The "Table of Contents of the Record," which is contained in the appendix to the Employer/Fund's brief, is 1½ pages long and contains only 28 entries. Within the record, however, are numerous exhibits such as deposition transcripts and medical records which are not set forth in the Employer/Fund's table of contents. Our review was made extremely difficult in this case because we were required to search the record for a number of exhibits which were not listed in the table of contents. We remind the Employer/Fund that this court is not a repository into which an appellant may dump thousands of unindexed record pages; thereby placing the burden upon the court to search through the record for relevant information. In the future, counsel for the Employer/Fund would be well served to file briefs made in compliance with the supreme court rules, as briefs that do not conform to those rules may be stricken and new briefs ordered.

Turning now to the merits of these consolidated appeals, we address the Employer/Fund's first argument; namely, that the reinstatement of the claimant's cases after they were dismissed by an arbitrator for want of prosecution was erroneous as a matter of law.

As noted earlier, both of the claimant's cases were dismissed on April 25, 2005. Section 7020.90 of the Rules of Practice before the Commission provides as follows:

"a) Where a cause has been dismissed from the arbitration call for want of prosecution, the parties shall have 60 days from receipt of the dismissal order to file a petition for reinstatement of the cause onto the arbitration call. Notices of dismissal shall be sent to [all] parties.

b) Petitions to Reinstate must be in writing. The petition shall set forth the reason the cause was dismissed and the grounds relied upon for reinstatement. The petition must also set forth the date on which Petitioner will appear before the Arbitrator to present his petition. A copy of the petition must be served on the other side at the time of filing with the Commission in accordance with the requirements of Section 7020.70.

c) Petitions to Reinstate shall be docketed, and assigned to be heard by the same Arbitrator to whom the case was originally assigned. Both parties must appear at the time and place for hearing. Parties will be permitted to present evidence in support of, or in opposition to, the petition. The Arbitrator shall apply standards of fairness and equity in ruling on the Petition to Reinstate and shall consider the grounds relied on by Petitioner, the objections of Respondent and the precedents set forth in Commission decisions." 50 Ill. Adm. Code §7020.90 (Conway Greene CD-Rom 2002).

The Employer/Fund's entire argument on this issue is based upon the failure of the claimant's petitions to set forth the date upon which they would be heard as required in section 7020.90(b) (50 Ill. Adm. Code §7020.90(b) (Conway Greene CD-Rom 2002)). In the "Statements of Exception" filed with the Commission in support of its petitions for review of the arbitrator's decisions in these cases, Tom Via argued not only that the arbitrator erred in granting the claimant's petitions for reinstatement but also that the petitions were untimely when originally filed because they did not comply with the provision of section 7020.90(b).

The claimant asserts that Tom Via waived any notice of the date upon which his petitions would be presented before the arbitrator. In support of his waiver argument, the claimant relies upon the statements of his attorney to the arbitrator that, in June of 2005, one of the attorneys representing Tom Via orally agreed to the reinstatement of both cases, and the October 31, 2006, letter, in which Tom Via's attorney wrote that her client had no objection to the reinstatement of both of the claimant's cases. The claimant also relies on section 7020.70(b)(2) of the Rules of Practice before the Commission, which provides that parties may waive the requirements of notice. See 50 Ill. Adm. Code §7020.70(b)(2) (Conway Greene CD-Rom 2002).

Although not binding upon us, we generally accord deference to the Commission's interpretation of its own rules. *Banks v. Industrial Comm'n*, 345 Ill. App. 3d 1138, 1141, 804 N.E.2d 629 (2004). In affirming and adopting the arbitrator's decisions, the Commission implicitly rejected Tom Via's arguments concerning the timeliness of the claimant's petitions seeking reinstatement of his claims. We find nothing clearly erroneous, arbitrary, or unreasonable about the Commission's actions in this regard.

Although the 60-day limit for filing a petition to reinstate a case after it has been dismissed by an arbitrator for want of prosecution is jurisdictional in nature, we do not believe that the same is true of the content requirements of such a petition as contained in section 7020.90(b). In *Banks v. Industrial Comm'n*, 345 Ill. App. 3d 1138, 804 N.E.2d 629 (2004), the Commission also found that a petition to reinstate which did not comply with section 7020.90(b) was timely filed. *Banks*, 345 Ill. App. 3d at 1141. Rather, the section 7020.90(b) violation in *Banks* formed the basis of the Commission's discretionary decision to deny a petition to reinstate. *Banks*, 345 Ill. App. 3d at 1141-43. As the Employer/Fund's only criticism of the claimant's petitions to reinstate is their failure to set forth the date upon which they would be heard as required in section 7020.90(b), we reject the argument that the Commission erred as a matter of law in reinstating the

claimant's cases. However, just as in *Banks*, we must address the question of whether the commission abused its discretion in the matter.

■ The decision to grant or deny a timely petition to reinstate is a matter which rests within the sound discretion of the Commission, and its determination will not be disturbed on review absent an abuse of that discretion. *Banks*, 345 Ill. App. 3d at 1140; see also *Conley v. Industrial Comm'n*, 229 Ill. App. 3d 925, 930, 594 N.E.2d 730 (1992). We find no abuse of that discretion in this case.

A party may waive statutory provisions designed for its benefit. See *Household Bank, FSB v. Lewis*, 229 Ill. 2d 173, 183, 890 N.E.2d 934 (2008). The notice provision of section 7020.90(b) is clearly for the benefit of the respondent. Requiring a claimant to set forth the date on which he will appear before the arbitrator to present his petition to reinstate works to minimize the prejudice to a respondent which might result from delays in prosecuting a claim such as the unavailability of witnesses or their diminished recollection of the facts. See *Banks*, 345 Ill. App. 3d at 1141-43.

The record in this case contains evidence that, as early as June 2005, Tom Via's attorney agreed to the reinstatement of the cases, which was to be accomplished on a "convenient" date when both parties were before the arbitrator on some other matter. The October 31, 2006, letter from Tom Via's attorney further supports the conclusion that Tom Via agreed to the reinstatement of both cases. Having agreed to reinstatement on some unspecified "convenient" date, Tom Via acquiesced in the deficient petitions filed by the claimant and, thereby, waived the protection of the notice provision in section 7020.90(b). Further, unlike the facts in *Banks*, it appears that any delay in calling the claimant's petitions to reinstate for hearing before the arbitrator was the product of an agreement to which the respondent, Tom Via, was a party.

■ There being no further assignments of error in the circuit court's order confirming the Commission's decision relating to the claimant's January 6, 1999, injury, we affirm the circuit court's judgment in our docket No. 5—08—0644WC.

■ Next, the Employer/Fund contends that the Commission's finding that the claimant's need for surgery on July 8, 2005, was causally related to his injury on May 28, 1998, is against the manifest weight of the evidence. However, the Employer/Fund has failed to cite any legal authority in support of its argument, and, as a consequence, the issue has been waived for purposes of this appeal. 210 Ill. 2d R. 341(h)(7); *Service Adhesive Co. v. Industrial Comm'n*, 226 Ill. App. 3d 356, 366, 589 N.E.2d 766 (1992). Waiver aside, we find the argument lacking in merit.

Whether a causal relationship exists between a claimant's employment and his injury is a question of fact to be resolved by the Commission, and its resolution of such a matter will not be disturbed on appeal unless it is against the manifest weight of the evidence. *Certi-Serve, Inc. v. Industrial Comm'n*, 101 Ill. 2d 236, 244, 461 N.E.2d 954 (1984). For a finding of fact to be contrary to the manifest weight of the evidence, an opposite conclusion must be clearly apparent. *Caterpillar, Inc. v. Industrial Comm'n*, 228 Ill. App. 3d 288, 291, 591 N.E.2d 894 (1992).

In his letter of March 3, 2007, Dr. Froehling stated his belief that the claimant's 1998 injury played a significant role with respect to the causation of his L5-S1 disc herniation and is related to the claimant's need for surgery in 2005. It is the function of the Commission to decide questions of fact, judge the credibility of witnesses, and resolve conflicting evidence. *O'Dette v. Industrial Comm'n*, 79 Ill. 2d 249, 253, 403 N.E.2d 221 (1980). In this case, the arbitrator relied upon Dr. Froehling's causation opinions and noted that Tom Via had not produced any credible evidence that the claimant's disc injury was not related to his work accident on May 28, 1998. The Commission adopted the arbitrator's finding in this regard, and we cannot say that the Commission's resolution of the issue is against the manifest weight of the evidence.

■ Finally, the Employer/Fund contends that the Commission's award of permanent partial disability benefits to the claimant for a 25% loss of a person as a whole as a result of his injury on May 28, 1998, is against the manifest weight of the evidence. Again, however, the Employer/Fund fails to support its argument with citation to authority in support of its argument, and, as a consequence, this issue too has been waived. 210 Ill. 2d R. 341(h)(7); *Service Adhesive Co.*, 226 Ill. App. 3d at 366. We also reject the argument on the merits.

The Employer/Fund appears to argue that the claimant's L5-S1 herniation is not causally related to his injury on May 28, 1998, and, as a consequence, the Commission's award of permanent partial disability benefits for a 25% loss of a person as a whole as a result of the claimant's injury on May 28, 1998, is against the manifest weight of the evidence. As noted earlier, however, Dr. Froehling's causation opinions sufficiently demonstrated a causal connection between the claimant's L5-S1 herniation and his injury at work on May 28, 1998. Having previously rejected the premise upon which the Employer/Fund's argument is based, we, likewise, reject its argument regarding the nature and extent of the claimant's injuries resulting from his May 28, 1998, accident.

Based upon the foregoing analysis, we affirm the circuit court's order confirming the Commission's decision relating to the claimant's May 28, 1998, injury which was docketed in this court as case No. 5—08—0645WC.

No. 5—08—0644WC, Affirmed.
No. 5—08—0645WC, Affirmed.

McCULLOUGH, P.J., and HUDSON, HOLDRIDGE, and DONOVAN, JJ., concur.